```
                  UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS
                                     )
UNITED STATES OF AMERICA             )
                                     )
          v.                         )   CR. NO. 04-10164-DPW
                                     )
SHON ROWELL                          )
                                     )
```

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTIONS TO SUPPRESS (SEARCH AND SEIZURE)

**Introduction**

The government hereby respectfully submits it opposition to Defendant's Motion to Suppress (Search and Seizure), referred to here as the "Motion." By the Motion, the defendant seeks to suppress "(1) statements made and items seized upon his arrest outside an apartment at 25 Wayne St., (2) selection of his picture from photo arrays prepared by Boston Police, and (3) items subsequently observed or seized, including a gun, from 25 Wayne St., Apartment No. 9 as a result of a search warrant obtained by Boston Police." Motion, p. 1.  Motion, p. 1.  For the reasons set forth below, the Motion should be denied.

**Facts**[1]

The robbery at 141 Homestead Street

At approximately 1:00 a.m. on March 1, 2004, Boston Police Officer Roland Robinson responded to an armed robbery call at an apartment building at 141 Homestead Street in Roxbury. A woman there claimed that a woman named "Jackie" and a black male had

---

[1]The government expects that the following evidence would be adduced at an evidentiary hearing.

robbed her.  According to the woman, the man placed a black gun to her head and threatened her and demander her money. "Jackie" then went through the woman's jacket and purse and took, among other things, $120.00 in cash, lottery tickets, a pack of Newport cigarettes, and a set of house keys with an attached tag that bore the name "Lugz," as well as attached consumer cards from Stop and Shop and Osco.

### The stop and arrest of the defendant

Approximately three hours later, at about 4:20 a.m., BPD Officers Brian Smigielski and Brian Farrell, along with Officer Robinson, the same officer who had answered the Homestead armed robbery call, responded to a radio call regarding a person with a gun at 25 Wayne Street, apartment #9, in Roxbury.  Upon their arrival, the officers spoke to a male named Terrence Phillips.

Mr. Phillips stated that he had gone to apartment #9 in an attempt to locate a female acquaintance named Kiet "Butter" Larkins, whom he said resided in the apartment.  He stated that when he knocked on the door, however, a male whom Mr. Phillips knew as "Rob," but who was later identified as the defendant, opened the door and told him that Ms. Larkins was not there. When Mr. Phillips persisted, the defendant produced a black handgun, pointed it at him, and told him to "Get the f**k out of here."  Mr. Phillips stated that he then fled and called "911."

When officers arrived they learned from Mr. Phillips that

the defendant was still inside the apartment. Accordingly, they went to the unit and knocked on the door and announced their presence. The defendant refused to open the door and stated that he could not allow the officers to enter because he did not live there. The officers then proceeded to set up a perimeter around the building. As they were doing so, the defendant exited the apartment and confronted the officers. A struggle ensued and it was violent enough that the defendant and at least one officer fell down a flight of stairs. The defendant was eventually subdued and restrained, however.

### The photo arrays

Officer Smigielski immediately entered the apartment to conduct a protective sweep and observed a black female later identified as Jacqueline Santiago. Ms. Santiago did not reside in the apartment but stated that Ms. Larkins, the woman that Mr. Phillips had come to see, is her cousin and a tenant of the apartment along with another woman. When Ms. Santiago further stated in response to questioning that she had been at 141 Homestead earlier in the evening, Officer Robinson realized that she and the defendant appeared to fit the descriptions of the robbers given by the victim.

As a result, officers subsequently transported the defendant and Ms. Santiago to the Area B-2 police station in Roxbury. They then created two separate photo arrays. Each photo array

contained nine photographs; one contained a photograph of the defendant and eight other men who generally matched his physical description, and the second contained a photograph of Jacqueline Santiago and eight other women who generally matched her physical description.

Officers showed the array containing the men to Mr. Phillips and he positively identified the defendant as the person who had pointed the black gun at him.  Mr. Phillips then circled the picture of the defendant and placed his initials next to the picture to reflect his identification.  Similarly, officers also brought in the robbery victim and showed her each photo array separately.  After viewing the first array, the woman positively identified the defendant as the person who put a black handgun to her head and robbed her in the hallway hours earlier at 141 Homestead Street, and she circled the picture and placed her initials next to it.  She then viewed the second array and positively identified Jacqueline Santiago as the female who was with the defendant and who went through her jacket and pocketbook.  As with the first array, the woman circled the picture of Jacqueline Santiago and placed her initials next to it to reflect her identification.

<u>The search warrant for unit 9 at 25 Wayne Street</u>

Based on the foregoing, and aware that the defendant did not have a firearm on his person when he was arrested, officers,

4

having secured the apartment, obtained a warrant that day to search apartment #9 at 25 Wayne Street for evidence of a firearm as well as any of the items taken from the victim during the hallway robbery at 141 Homestead Street.[2]  In the course of the search, executed that day at about 1:30 p.m., BPD Detective Marc Cooper searched the rear bedroom and recovered from underneath a bureau a black, Smith and Wesson Model 69, 9mm handgun, bearing the serial number A352194, loaded with eight rounds of ammunition in the magazine and one live round in the chamber.  Other items recovered during the search matched the items taken from the victim of the robbery at Homestead Avenue.

**Argument**

**THE POLICE WERE ENTITLED TO STOP AND/OR ARREST THE DEFENDANT**

A.  The legal framework.

In Terry v. Ohio, 392 U.S. at 22, the Supreme Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to effect an arrest."  In determining whether a particular investigatory seizure or search violates the Fourth Amendment's protection against unreasonable searches or seizures, the inquiry is the now familiar two-prong test

---

[2]The defendant has attached the relevant documents as exhibits to his motion.

announced in Terry -- "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 19-20; see also United States v. Sharpe, 470 U.S. 675, 682 (1985); United States v. Stanley, 915 F.2d 54, 55 (1st Cir. 1990); United States v. Trullo, 809 F.2d 108, 111 (1st Cir. 1987). To justify the need to stop and search, the Court held that "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. at 21. The facts and inferences the officer relies on are to be judged in the context of the "totality of the circumstances -- the whole picture." United States v. Cortez, 449 U.S. 411, 417 (1981).

If the officers have more than an articulable suspicion of criminal activity, i.e., if they have probable cause to believe the suspect has committed a crime, they may effect a warrantless arrest. United States v. Martinez-Molina, 64 F.3d 719, 726 (1st Cir. 1995). The First Circuit has described "probable cause" as a "fluid concept" that "'turn[s] on the assessment of probabilities in particular factual contexts,'" ibid. (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)), and that "must be evaluated in light of the totality of the circumstances." Ibid. ( citations omitted). To establish probable cause, the

government "need not present the quantum of proof necessary to convict." United States v. Torres-Maldonado, 14 F.3d 95, 105 (1st Cir. 1994) (citation omitted). Rather, "it need only show that, at the time of the arrest, the facts and circumstances known to the arresting officers were sufficient to warrant a prudent person in believing that the defendant had committed or was committing an offense." Ibid.

   B. Analysis.

The defendant was not stopped for Fourth Amendment purposes until he was subdued following the struggle on the stairs. California v. Hodari D., 499 U.S. 621, 626 (1991)(police officer's pursuit of defendant does not constitute "seizure" absent physical contact with defendant or evidence that defendant yielded to show of authority); United States v. Sealey, 30 F.3d 7, 9 (1st Cir. 1994). Relying on all of the facts leading up to this moment, there is no issue that the police were entitled to stop the defendant. Terrence Phillips indicated that the person inside the apartment was armed, and the defendant's conduct only bolstered the concern that he in fact possessed a weapon. He refused to open the door for the police when they arrived. When he finally did so, he was confrontational. And instead of dealing with the police, he attempted to flee past them out the building.

In the government's view, these articulable facts easily supported a belief the defendant was armed and was attempting to elude the police, thus giving the police probable cause to arrest him.  Even assuming for the sake of argument that these facts do not support a finding of probable cause, they unquestionably supported a reasonable articulable suspicion that the defendant was armed.  The articulable suspicion standard is not a stringent one.  "The Fourth Amendment requires `some <u>minimal level</u> of objective justification' for making the stop."  <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989), <u>quoting</u>, <u>INS v. Delgado</u>, 466 U.S. 210, 217 (1984) (Emphasis added).  As stated by the United States Supreme Court:

> That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence.  We have held that probable cause means "a fair probability that contraband or evidence of a crime will be found," <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983), and the level of suspicion required for a <u>Terry</u> stop is obviously less demanding than that for probable cause, <u>see</u> <u>United States v. Montoya de Hernandez</u>, 473 U.S. 531, 541, 544 (1985).

<u>United States v. Sokolow</u>, 490 U.S. at 7; <u>see</u> <u>also</u> <u>United States v. Jackson</u>, 918 F.2d 236, 239 (1st Cir. 1990).

Accordingly, because the officers by virtue of Terrence Phillip's information and their own interaction with the defendant had every reason to suspect he was armed, they were entitled to at least stop him to investigate further.  And to be

clear, given the defendant's recalcitrant and potentially violent resistance, this included the right to physically subdue and handcuff him. See Graham v. Connor, 490 U.S. 386, 396 (1989)(Where the Supreme Court "recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.").[3]

**Conclusion**

In light of the foregoing, the police did not violate any of the defendant's protectible interests. The Court therefore should deny the defendant's motion to suppress.

```
                                Respectfully submitted,
                                MICHAEL J. SULLIVAN
                                United States Attorney
                          By:
                                /s/Donald L. Cabell
                                DONALD L. CABELL
                                Assistant U.S. Attorney
```

---

[3] The defendant also contends that evidence recovered from the subsequent search of the apartment and two witness identifications should be suppressed. However, the defendant bases the argument solely on the narrow ground that the evidence flows from the unconstitutional stop of the defendant and therefore constitutes fruit of the poisonous tree. Motion at p. 10-11. ("The identifications and subsequent seizures as a result of that search warrant were therefore a direct result of the illegal arrest of defendant and must therefore be suppressed."). Accepting for the sake of argument the questionable premise that all the events following the defendant's stop/arrest flowed from the stop/arrest itself, it suffices to note that, because this argument is wholly derivative of the defendant's argument challenging his stop, it fails for the reasons noted above.